UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MARK GREEN,                                  :
                                                                          03 Civ. 908 (GBD) (DF)
                                 Petitioner,           :

                 -against-                              :          **REPORT AND**
                                                                          **RECOMMENDATION**
JAMES J. WALSH,                            :

                                 Respondent.        :
-----------------------------------------------------------------X

**TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:**

     *Pro se* Petitioner Mark Green ("Petitioner") seeks a writ of habeas corpus under

28 U.S.C. § 2254, following his 1999 jury conviction for two counts of Rape in the First Degree

and one count of Assault in the Second Degree, in New York State Supreme Court, New York

County.  Petitioner was sentenced to two determinate, concurrent terms of 25 years each for the

rape counts, to run consecutively to a determinate term of seven years for the assault count.

Petitioner is currently incarcerated at the Sullivan Correctional Facility in upstate New York.

     Petitioner challenges his conviction on the grounds that the trial court violated his due

process rights by improperly allowing the admission of incriminating hearsay testimony, and, with

respect to his assault conviction only, that the evidence at trial was insufficient as a matter of law to

prove his guilt beyond a reasonable doubt.  (*See* Petition under 28 U.S.C. § 2254 for Writ of Habeas

Corpus, dated Jan. 16, 2003 ("Petition").)  Petitioner also seeks to raise additional habeas claims

resulting from the state court's denial of his post-conviction motion for a DNA testing order

pursuant to New York Criminal Procedure Law Section 440.30.  Liberally construed,[1] these

---

[1] *See Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995) ("[t]he complaint of a *pro se*
litigant is to be liberally construed in his favor") (citing *Haines v. Kerner*, 404 U.S. 519, 520
(1972)); *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983) (where a petitioner is

additional claims appear to allege Petitioner's "actual innocence," as well as a *Brady*[2] violation

based on the non-disclosure of information relating to the DNA of a semen sample, and a due

process violation based on the state court's denial of his Section 440.30 motion.

For the reasons set forth below, I recommend that all of Petitioner's claims be denied, and

that the Petition be dismissed in its entirety.

## FACTUAL BACKGROUND

The facts underlying Petitioner's conviction involve the attack and rape of a 55 year-old

woman named D.W.[3]  According to D.W.'s testimony at trial, on the evening of October 20,

1998, at about 12:30 a.m., she left the single room occupancy hotel where she resided on West

43rd Street in Manhattan.  (*See* Trial Transcript, dated June 4, 1999 ("6/4/99 Tr.") at 40, 43-44,

73.)  Because it was a warm evening, D.W., who had been drinking malt liquor and smoking a

marijuana cigarette in her room, walked over to Eighth Avenue and West 40th Street, where

there were "[l]ots of folks" outside.  (*Id.* at 44, 75.)  There, D.W. saw her friend Bobby, with

whom she shared a "tiny" amount of liquor.  (*Id.* at 44-45.)  D.W. then went into a building

adjacent to the parking lot and continued to drink there, until one of the tenants asked her to

leave.  (*Id.* at 45.)  Admittedly intoxicated, D.W. went outside and saw a person she knew as

_____

proceeding *pro se* and "lack[s] expertise," the Court "should review [his] habeas petition[] with a lenient eye"); *Burgess v. Goord*, No. 98 Civ. 2077 (SAS), 1999 WL 33458, at *1 (S.D.N.Y. Jan. 26, 1999) (holding that "the mandate to read the papers of pro se litigants generously makes it appropriate to consider . . . additional materials" outside the pleadings).

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

[3] To protect the victim's privacy, only her initials will be used.

"A Train," whom she had known "in passing for about four years" and had seen at least 20 times before. (*Id.* at 46.)

Eventually, D.W., "A Train," and another man went into a bus parking lot, on West 40th Street between Eighth and Ninth Avenue. (*Id.* at 48-49.) Although D.W. voluntarily entered the parking lot, once inside the lot, "A Train" and the other man pushed her aboard one of the buses, against her will. (*Id.* at 49-50, 100.) Once inside the bus, the men began taking D.W.'s clothes off, while she screamed. (*Id.* at 50.) In a seeming effort to stop her from screaming, the men then began choking and hitting her with their fists. (*Id.* at 50-51.) According to D.W., "A Train" was the first one to hit her, and he did so "[a]ll in [her] eyes" and her face. (*Id.* at 50, 53.) The men then took several turns raping her, and continued choking her, hitting her in her face, and banging her head on the floor "countless" times. (*Id.* at 51-55.)

Although D.W. was "in and out of being conscious" as she lay on the floor in the back of the bus, she was aware that the men eventually stopped their attack, and she heard footsteps exiting the bus. (*Id.* at 55.) She then got up and found her pants and shoes, but could not find her underwear. (*Id.* at 56.) D.W. got dressed, walked home, and, feeling "all swollen and in pain," encountered one of her neighbors, Bernard Robinson ("Robinson"), in the lobby of her building. (*Id.* at 56; *see also id.* at 124.) According to D.W., Bernard looked at her face and told her that he had "to call the police or the ambulance." (*Id.* at 57.) D.W. then went up to her room, where Bernard eventually joined her. (*Id.*)

At approximately 2:00 a.m., New York City Police Department Officer Robert Welsome ("Officer Welsome") and Michael Flood ("Officer Flood") arrived at D.W.'s door, which Robinson opened. (*Id.* at 121-24.) Officer Welsome saw D.W. in the room and noticed that

D.W.'s eyes were swollen shut, and that her face and neck were also swollen. (*Id.* at 125.) He observed that the shoulder of her jacket was "covered in blood," and that there was also blood on her shirt and pants, which were on inside out. (*Id.* at 125.) Officer Flood also noticed that D.W.'s clothing was "full of blood." (*Id.* at 175.)

Although D.W. appeared to be in pain and had trouble speaking, she told Officer Welsome that she was raped by someone she knew as "A Train" and two other individuals.[4] (*Id.* at 126-27.) The officers then contacted an ambulance, and D.W. was found to be in good enough condition to be taken back to the location where the attack occurred, so that she could try to identify the individuals involved. (*Id.* at 128.)

The officers took D.W. by patrol car to a parking lot on West 40th Street, in which red double-decker buses were parked. (*Id.* at 129.) D.W. identified a bus in the back of the lot as the location of her attack. (*Id.* at 130.) While D.W. remained in the patrol car, Officer Welsome looked inside that particular bus, and saw that the seats and floor in the rear of the bus had blood on them. (*Id.* at 129-30.) Although no one was in the bus at that time, the officers discovered four males and one female in other buses parked in the lot. (*Id.* at 130.) One by one, Officer Welsome brought each of these five individuals over to the car in which D.W. was sitting. (*Id.* at 132.) D.W. recognized one of her attackers among the five individuals, and identified him as "A Train." (*Id.* at 132; *see also id.* at 57-58.) Officer Welsome, who had found "A Train" in the bus immediately to the right of the bus where D.W. had said she was attacked, then arrested him

_____

[4] During a subsequent interview in the hospital on the afternoon of October 20, 1998, D.W. told Officer Welsome that two individuals, rather than three, were involved in her attack. (6/4/99 Tr. at 164-65.) Nonetheless, despite this change, Officer Welsome testified that, during both interviews, D.W. named "A Train" as one of her attackers, and that "A Train" was the only name she mentioned. (*Id.* at 169.)

and took him to the police station. (*Id.* at 131-33.) At the police station, the individual identified himself as Mark Green – *i.e.*, Petitioner – and, when asked by Officer Welsome if he had any nicknames, Petitioner replied affirmatively, "A Train." (*Id.* at 133-34.)

## PROCEDURAL BACKGROUND

### A.    Pre-Trial Rulings

Petitioner, through counsel, made various pre-trial motions, which do not have direct relevance to this habeas proceeding.[5] In addition, on June 3, 1999, the prosecution made an evidentiary application to introduce, through Officer Welsome's testimony at trial, the statement made by D.W. to Officer Welsome that "A Train" had raped and beaten her. (*See* Transcript of Pre-Trial Proceedings, dated June 3, 1999 ("6/3/99 Tr.") at 9-10.) The prosecution argued that, although the statement constituted hearsay, it would be admissible at trial under the "prompt outcry" exception to the hearsay rule, because the statement had been made within 35 to 40 minutes of the incident, and because it did not reveal details of the sexual assault. (*See id.*) In response, Petitioner's counsel argued that the statement should not be admitted into evidence because "there was sufficient time for [D.W.] to cook up a story and to possibly confuse the facts and reflect on what happened." (*See id.* at 11-12.) Noting that Petitioner's counsel appeared to

_____

[5] The motions made by Petitioner generally concerned the validity of Petitioner's arrest; the propriety of the procedure used to identify him; and the admissibility of clothing seized from him following his arrest and two statements he made following his arrest, including, "My name is A Train" and "I'm scared. I'm scared. That crack head won't go to court. I can't believe she called the cops." (*See* 5/24/99 Tr. at 2-8.) After a hearing on the issues raised in those motions, the trial court found that there was probable cause to arrest Petitioner; that the procedure through which D.W. identified Petitioner as one of her attackers was proper; that Petitioner's clothing, which contained blood "visible to the police," was properly seized as "evidence incident to a lawful arrest"; and that Petitioner's two statements would be admissible at trial. (*See id.* at 40-46.)

"be mixing up the other hearsay [exception], the excited utterance," the court held the statement to be admissible. (*Id.* at 12-13.) The court nonetheless offered Petitioner's counsel the opportunity to "do further research" on the issue, and informed him that the court would "leave this open, if you wish to argue." (*Id.* at 13.) Petitioner's counsel, however, stated that he had "nothing further" (*id.*), and made no later attempt to revisit the issue.

**B.    Trial**

Petitioner's jury trial began on June 4, 1999. The prosecution's witnesses included D.W., Officer Welsome, the attending physician who examined D.W. at St. Vincent's Hospital following her attack, and the forensic scientist who analyzed evidence taken from D.W. and Petitioner on October 20, 1998. The sole defense witness was Petitioner.

**1.    D.W.'s Testimony**

At trial, D.W. conceded that she had a substance abuse problem, dating back to 1968, when she had suffered a stroke and become addicted to morphine. (6/4/99 Tr. at 42-43.) D.W. testified that, over time, she had abused alcohol, had used cocaine, heroin and marijuana, and had attended "rehab" seven or eight times, including in the month before Petitioner's trial. (*Id.* at 43.)

As to the events on the night of October 19, 1998 and during the pre-dawn hours of October 20, 1998, D.W. openly admitted to drinking alcohol and smoking marijuana prior to being attacked.[6] (*Id.* at 77.) Further, on cross-examination, D.W. conceded that, on previous occasions, after mixing marijuana and liquor, she had "sometimes" experienced a "blackout."

---

[6] According to her testimony, D.W. began drinking in her room at about 9:30 p.m. on the evening of October 19, 1998, but she did not leave her room until approximately 12:30 a.m. on October 20, 1998, after which the attack occurred. (*See* 6/4/99 Tr. at 73-74.)

(*Id.* at 76.)  Nonetheless, although D.W. stated that her memory was "a little blurry" with respect to certain parts of her activities on October 19 and October 20, 1998 (*see id.* at 45), she was able to recall some specifics about that night, including details regarding her attack (*see, e.g., id.* at 49-56).  For example, D.W. testified that she remembered two men being present on the bus, and that she remembered them removing her clothing, "choking" her and "banging in" her face, banging her head against the bus floor, and taking turns raping her.  (*See id.*)  D.W. further testified that she was "absolutely" sure that neither man used a condom, although she could not "be sure" that "either one of them ejaculated in or on" her.  (*See id.* at 55.)  In addition, although D.W. was not able to identify the other man involved in the attack, she had no doubt "whatsoever" that "A Train" had been one of the men who beat, choked and raped her.  (*See id.* at 58, 71.)

D.W. also recalled speaking with Officer Welsome in her room (*id.* at 106), and returning to the parking lot with the officers, where she remembered seeing "A Train" and identifying him as one of the men who had beaten and raped her.  (*Id.* at 58.)  D.W. also remembered that, after identifying "A Train" at the parking lot, she was taken to St. Vincent's hospital, where doctors examined her and assembled a rape kit consisting of various samples taken from her.  (*Id.* at 59-60.)

Finally, at trial, D.W. identified Petitioner as the man she knew as "A Train."  (*Id.* at 47.)

### 2.     Officer Welsome's Testimony

Officer Welsome testified at trial about the events leading to Petitioner's arrest, including the statements D.W. made to Officer Welsome when he first saw her in her room.  (*See* 6/4/99 Tr. at 119-127.)  Specifically, Officer Welsome testified that D.W. told him that she had been

raped, and that a person by the name of "A Train" had raped her.  (*See id.* at 126-27.)  At trial,

Petitioner did not object to Officer Welsome's testimony with regard to those statements made

by D.W.  (*See id.*)

Officer Welsome also gave testimony about processing Petitioner at the police station

following his arrest.  (*See id.* at 133-35.)  Officer Welsome testified that, while Petitioner was in

custody, Officer Welsome took Petitioner's clothing because it was "covered in blood," which

appeared to be fresh.  (*Id.* at 137.)  Officer Welsome then "vouchered" each article of Petitioner's

clothing and sealed the items in a paper bag.  (*Id.* at 137-39.)  Officer Welsome also testified that,

on the same day, he took D.W.'s clothing, which he vouchered as well.  (*Id.* at 153.)

At about 3:30 a.m., Officer Welsome completed his paperwork regarding Petitioner's

arrest, and then exited the room where Petitioner was being held in a cell.  (*Id.* at 134.)  As he

exited, Officer Welsome overheard Petitioner say, "I'm scared.  I'm scared.  That crack head

won't go to court.  I can't believe she called the cops."  (*Id.* at 135-36.)  Officer Welsome, who

had not spoken to Petitioner, saw Petitioner rocking back and forth, and testified that Petitioner

did not appear to be talking to him.  (*Id.* at 136.)[7]

### 3. Testimony of the Emergency Room Physician

Emergency room physician Dr. Craig Tenenbaum ("Tenenbaum"), who also testified at

trial, examined D.W. at approximately 3:00 a.m. on October 20, 1998.  (*See* 6/9/99 Tr. at

346-47.)  Tenebaum testified that, during his examination of D.W. at St. Vincent's Hospital, he

---

[7] Petitioner, who admits that he was drinking and "was a little high" that night (*see* 6/9/99 Tr. at 438), does not recall making these statements (*id.* at 441-43).

observed that both of D.W.'s eyes had subconjunctival hemorrhages; that she had black and blue marks on the right side of her head; that her mouth, lips, jaw, nose, face and neck were swollen; and that her mouth was bleeding. (*Id.* at 347-48, 351, 362.) Further, Tenenbaum testified that D.W. was apparently experiencing severe headaches and blurred vision in the emergency room. (*Id.* at 347-48.) According to Tenebaum, D.W.'s injuries were consistent with her having experienced multiple blows to the head and having been punched repeatedly with a closed fist. (*Id.* at 352-53.) Further, Tenebaum testified that the swelling of D.W.'s neck and the subconjunctival hemorrhages in her eyes were consistent with having been strangled, although the hemorrhages could also have been caused by direct or indirect trauma to the head, or could have occurred "spontaneously" as a result of "forcefully trying to resist or forcefully bearing down as you get someone strangling your neck." (*Id.* at 354-55.)

Tenenbaum also testified that a rape kit was assembled using samples taken from D.W. (*See id.* at 357.) Tenenbaum testified that a vaginal examination revealed "some latent tenderness, tenderness around the vagina and a reddish discharge coming out of the vagina" which was "[m]ost likely blood." (*Id.* at 358.) According to Tenebaum, the findings were consistent with "tearing and bleeding," which were in turn consistent with the use of force. (*Id.* at 358-60.)

### 4. <u>Testimony of the Forensic Scientist</u>

Emma Tibbo ("Tibbo"), a forensic scientist at the New York City Office of the Chief Medical Examiner, also testified at trial. (*See* 6/7/99 Tr. at 225-43.) Tibbo tested various articles of clothing worn by Petitioner and D.W. on the night of the attack, as well as blood samples taken from both of them. (*See id.* at 245-49.) Although Tibbo found no blood or semen

on Petitioner's sweater, belt, socks or sneakers, she found blood on his boxer shorts, the sleeves of a blue sweatshirt he also wore that night, the left leg of his jeans, and his T-shirt. (*Id.* at 249-54.)[8] Tibbo then compared these stains with DNA extracted from both Petitioner's and D.W.'s blood, and determined that blood found on Petitioner's clothing matched D.W.'s blood. (*See, e.g., id.* at 253.) Specifically, Tibbo determined that the odds that the blood taken from these stains came from an African-American other than D.W. were as follows: for blood taken from the left sleeve of Petitioner's sweatshirt and his boxer shorts, 1 in 9,500,000,000,000; for blood taken from the right sleeve of Petitioner's sweatshirt, 1 in 340,000; and for blood found on Petitioner's jeans, 1 in 5,400,000,000. (*See id.* at 253-60.)[9] In addition, Tibbo determined that a stain on the bottom of Petitioner's T-shirt contained a mixture of D.W.'s blood and Petitioner's own genetic material, which, according to Tibbo, could be attributed to Petitioner's skin cells having "flaked off" onto his T-shirt, simply by his wearing it. (*Id.* at 256-57.)

With respect to D.W.'s clothing, Tibbo found blood, as well as a semen stain, on D.W.'s jeans. (*See id.* at 261-64.) In light of the fact that D.W. was "bleeding profusely," Tibbo decided that "it would not be worth typing" the blood on her clothing. (*Id.* at 262.) Tibbo,

---

[8] Petitioner later testified that, after he came into contact with D.W. on the bus, he obtained a sweater from people who were giving out food and clothing on the street. (*See* 6/9/99 Tr. at 406-08.) Although it is not entirely clear from the trial transcript (in part due to inconsistencies in Petitioner's testimony), it appears that Petitioner was wearing the sweatshirt when he came into contact with D.W., and that he subsequently obtained the sweater. (*See id.* at 405-08; *see also id.* at 425-26.)

[9] Although Petitioner argues that Officer Welsome "purposely combined the clothing of Petitioner" with that of D.W. in order to "build a case against [Petitioner] which had not existed in the past" (*see* Letter from Petitioner dated Mar. 12, 2006 ("Pet. 3/12/06 Reply")), Tibbo also testified that part of Petitioner's sweatshirt was "saturated" with blood, and that this could not have occurred simply as a result of the sweatshirt "rub[bing] up against" another item of clothing that had blood on it (*see* 6/7/99 Tr. at 280-81).

however, testified that the semen found on D.W.'s jeans was "typed," and that she was "[a]bsolutely sure" that the semen came from *another* individual, who was *not* Petitioner. (*Id.* at 262-64.) Finally, Tibbo also tested samples taken from D.W. as part of the rape kit. (*Id.* at 264.) Although the samples tested negative for semen, the vaginal sample tested positive for blood, which, because it was presumed to be D.W.'s own blood, was not "typed." (*See id.* at 265-66.)

### 5. Petitioner's Testimony

Petitioner, who testified that he was known to everyone as "A Train,"[10] stated that on October 19, 1998, he was on 40th Street in Manhattan. (*See* 6/9/99 Tr. at 385, 395, 402-03.) According to Petitioner, he saw D.W. there, whom he recognized from having seen her in the area many times over the course of several years. (*Id.* at 386, 401.) Petitioner testified that, later in the evening, he saw D.W. and a man smoking crack outside a building on 40th Street between Eighth and Ninth Avenues, and that he saw them enter the building.[11] (*Id.* at 386-87.) Petitioner then stood near the building, drinking beer and talking with a "homeless guy that was hanging out there." (*Id.* at 387-90.) As he stood near the building, he saw D.W. – who, according to Petitioner, was uninjured at that time – and her companion emerge from the building. (*Id.* at 389,

---

[10] Further, Petitioner, who testified that he was a three-time convicted felon and had been arrested several times prior to his October 20, 1998 arrest, also testified that on two occasions, he had lied and given authorities various aliases because he was "a little high or drunk or something." (*See id.* at 398-401.)

[11] D.W. testified that, although she had used cocaine and heroin in the past, she had not used heroin since 1970, and had last used cocaine in August, 1998. (*See* 6/4/99 Tr. at 75-76.)

403-04.) Petitioner testified that he then went to the parking lot with the homeless person and boarded a red double-decker bus "to go to sleep." (*Id.* at 390.)[12]

Petitioner testified that he did not have sex with nor "beat up" D.W. on October 20, 1998. (*Id.* at 396.) Rather, Petitioner testified that, while on the bus he had boarded, he heard someone on an adjacent bus screaming "stop" and "help me." (*Id.* at 412.) According to Petitioner, he went to investigate and boarded the adjacent bus, where he saw a "dude" on top of a woman, having sex with her. (*See id.* at 391-92.) Petitioner noticed that the couple was lying on the seats of the bus, that the woman was not wearing pants, and that there was blood "on the chair of the bus, the cushion." (*Id.* at 396-97.) Petitioner, however, did not recognize the woman as D.W., and did not see that her face was bleeding. (*See id.* at 416-17.) Although Petitioner testified that he did not see the "dude" beating up D.W. or punching her (*see id.* at 415), and that he believed the sex to be consensual (*see id.* at 417), Petitioner nonetheless asserted that he "grabbed the dude" in an attempt to separate them, but that the man ran off. (*Id.* at 393.) Petitioner also testified that his own "glasses came off," so he began to look for them. (*Id.*) Petitioner found his glasses, put them on, got off the bus, and then observed that he had blood on his shirt. (*Id.*) Petitioner maintained that the blood was transferred to his shirt when he tried to remove from the bus the "dude" who was having sex with D.W. (*See id.* at 396.)

As described above, Petitioner testified that he went to the adjacent bus because he was concerned about the person whom he heard screaming. (*Id.* at 424.) Nonetheless, and even though Petitioner suspected that the man who then ran off had "just done something bad"

---

[12] Petitioner's testimony, however, was inconsistent with respect to whether the homeless person accompanied him to the parking lot initially, as described above, or joined Petitioner later, after Petitioner purportedly witnessed the attack on D.W. (*See* 6/9/99 Tr. at 409-13.)

because the woman was saying "help me, help me," Petitioner testified that he did not look to see if the woman was hurt, did not ask her if she was okay, did not call 911, and did not look for a police officer. (*See id.* at 421-25.) Rather, Petitioner testified that he only looked for his glasses and then "got right off" of the bus. (*See id.* at 423-24.) According to Petitioner, he then went to the Port Authority, across the street from the parking lot, to use the bathroom and wash the blood off. (*Id.* at 393-94.) Petitioner further testified that, instead of washing his hands first, he "pulled down [his] shorts" to go to the bathroom, and subsequently washed his hands. (*Id.* at 394; *see also id.* at 435-36.) Petitioner testified that he then left the Port Authority, obtained a new sweater from someone on the street, and returned to the bus he had been on initially, where he "tried to go to sleep." (*Id.* at 394, 406-07.) Petitioner, however, then saw "light[s] flash," and he was removed from the bus by the police. (*Id.* at 394-95.) Petitioner testified that, subsequently, "somebody pointed [him] out and the police then grabbed . . . and arrested [him]" without telling him what he was being arrested for. (*Id.* at 394-95.)

### C. Petitioner's Conviction and Sentence

On June 10, 1999, the jury convicted Petitioner of two counts of Rape in the First Degree, and one count of Assault in the Second Degree. (*See* 6/10/99 Tr. at 601-05.) On July 6, 1999, the trial court sentenced Petitioner to determinate, concurrent terms of 25 years imprisonment on each count of rape. On the assault conviction, the court sentenced Petitioner to a seven-year term of imprisonment, which the trial court ordered Petitioner to serve consecutively to the terms imposed for the rape convictions. (*See* 7/6/99 Tr. at 19-20.)

13

## D. **Direct Appeal**

In March 2002, Petitioner appealed his conviction to the Appellate Division, First Department, on the grounds that (1) the trial court had violated his rights – under the Fourteenth Amendment and state law – by improperly admitting, under the "prompt outcry" exception to the hearsay rule, Officer Welsome's testimony that D.W. had told him that "A Train" raped her; (2) the evidence was insufficient as a matter of law to prove beyond a reasonable doubt that Petitioner had used the floor of the bus to cause physical injury to D.W.; and (3) the trial court had erred in imposing consecutive sentences for the convictions of rape and assault, as the force which constituted the assault was also a material element of the rape. (*See* Declaration of Willa J. Bernstein in Opposition to Writ of Habeas Corpus, filed May 28, 2003 ("Bernstein Decl.") (Dkt. 9), Ex. A.)

In a Decision and Order dated October 15, 2002, the Appellate Division unanimously affirmed Petitioner's conviction. (*See* Bernstein Decl., Ex. C.) With respect to Petitioner's claim that the trial court had erroneously admitted evidence under the "prompt outcry" hearsay exception, the Appellate Division held that Petitioner's appellate argument was unpreserved, as Petitioner had "argued against admission of this testimony on a completely different basis." (*Id.*, Ex. C at 27-28.) Although the Appellate Division declined to review the claim in the interest of justice, it nonetheless noted that, were it to review the claim on the merits, it would find "that the officer's concise, accurate representation of the victim's one-sentence statement did not convey accompanying details beyond those necessary to elicit the nature of the complaint." (*Id.*, Ex. C at 28.) As to Petitioner's legal insufficiency claim, the Appellate Division concluded that any challenge to his assault conviction was unpreserved, and declined to review the claim in the

interest of justice. (*Id.*, Ex. C at 27.)  The court stated, however, that, were it to review the merits

of the claim, it would find that the conviction was based on legally sufficient evidence. (*Id.*)

Finally, the Appellate Division held that the trial court had properly imposed consecutive

sentences for the rape and assault convictions based on evidence of acts of "forcible

compulsion," which formed the basis for "the separate and distinct act of rape." (*Id.*, Ex. C

at 28.)

On October 30, 2002, Petitioner sought leave to appeal to the New York Court of

Appeals. (*See* Bernstein Decl., Ex. D.)  Petitioner's application for leave included each of the

claims Petitioner raised on appeal to the First Department. (*See id.*)  On January 7, 2003, the

Court of Appeals denied Petitioner's application without opinion. *See People v. Green*, 99

N.Y.2d 582, 582 (2003).

### E.     Habeas Petition and Motion for DNA Testing

On January 16, 2003, Petitioner filed the instant Petition,[13] to which Petitioner annexed

his appellate brief.  The Petition, however, raises only two of the three grounds previously raised

by Petitioner on appeal in state court: (1) that the trial court improperly admitted as "prompt

outcry" evidence Officer Welsome's testimony regarding D.W.'s statement to him that "A Train"

had raped her, and (2) that the evidence at trial was insufficient as a matter of law to prove

beyond a reasonable doubt that Petitioner used the floor of the bus to cause physical injury to

---

[13] Although the Court's docket reflects a filing date of February 7, 2003 (*see* Dkt. 2), a
*pro se* prisoner's papers are deemed filed when they are handed over to prison officials for
forwarding to the Court. *See Houston v. Lack*, 487 U.S. 266, 270 (1988).  Thus, in the absence
of evidence to the contrary, the Court will deem the Petition to have been filed on January 16,
2003, the date Petitioner signed it. *See, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165
(S.D.N.Y. 2000).

D.W. (*See* Petition.) On May 28, 2003, Respondent filed an opposition to the Petition, including the Bernstein Declaration and exhibits thereto (Dkt. 9), together with a Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Resp. Mem.") (Dkt. 7). In accordance with this Court's Scheduling Order (*see* Dkt. 10), Petitioner timely submitted a reply on June 4, 2003 ("Pet. Reply").

On February 22, 2003, Petitioner also moved this Court, under Rules 6 and 7 of the Rules Governing Section 2254 Cases in the United States District Courts, for leave to obtain discovery and to expand the record of this habeas proceeding, and to stay resolution of the proceeding "until disclosure is completed." (Notice of Motion Order Directing Disclosure and Discovery (Dkt. 4).) Specifically, Petitioner sought production of the "DNA analysis" of the semen sample found on D.W.'s jeans (a sample that, through prior DNA testing, had already been found *not* to have been his, as was disclosed at trial), and, for reasons that are unclear, an order directing that a new DNA test be performed on that sample. (*See id.; see also* Affidavit in Support [of] Order Directing Disclosure and Discovery, at ¶ 11.)

### F. The Stay of These Proceedings, Pending Resolution of Petitioner's Section 440.30 Motion

On January 15, 2004, this matter was referred to me for a report and recommendation. (*See* Dkt. 12). On April 4, 2005, however, Petitioner moved to stay this habeas proceeding in its entirety, so that Petitioner could first return to the state court to seek further DNA testing of the semen sample, pursuant to Section 440.30 of the New York Criminal Procedure Law. In his motion, Petitioner informed this Court that, on March 9, 2005, he had commenced a proceeding in the state court pursuant to Section 440.30, in order to "exhaust his DNA test claim." On April 22, 2005, this Court granted Petitioner's request for a stay pursuant to *Zarvela v. Artuz*, 254 F.3d

374, 480-82 (2d Cir. 2001), and this habeas action was removed from the active docket of the

Court (*see* Dkt. 13).

On July 19, 2005, the trial court denied Petitioner's Section 440.30 motion, holding:

> [A]s defendant acknowledges in his moving papers, the item
> defendant presently seeks DNA testing on was tested prior to his
> trial. Emma Tibbo, a forensic scientist employed by the Office of
> the Chief Medical Examiner of the City of New York, testified as
> to the results of that testing, specifically that the DNA profile of
> the semen stain recovered from the complainant's pants did not
> match the defendant's DNA profile.
>
> Because the item was tested and the results were made know[n] to
> the jury, there is no basis for having that evidence tested again.

*People v. Green*, Indictment No. 9252-98 (N.Y. Sup. Ct. July 19, 2005) (Decision and Order).

On January 24, 2006, the Appellate Division, First Department, denied Petitioner leave to appeal

the trial court's decision, without opinion. *See People v. Green*, No. M-4954, 2006 N.Y. App.

Div. LEXIS 782 (1st Dep't Jan. 24, 2006).

On February 7, 2006, after completion of the Section 440.30 proceedings, Petitioner

submitted an affidavit to this Court, seeking to restore this habeas action to the Court's calendar.

(*See* Affidavit in Support of Motion for Renew His Petition for a Writ of Habeas Corpus ("Pet.

2/7/06 Aff").) Although, in his affidavit, Petitioner does not state that he is seeking leave to

amend his Petition to add any new claims, he does cite to Federal Rules of Civil Procedure 15(a)

and (c), and, liberally construing his affidavit, it appears that Petitioner is seeking to add a claim

of "actual innocence" (*see id.* at 3), which he did not previously articulate in his Petition. In

addition, although Petitioner does not frame his arguments in legal terms, it seems that Petitioner

may also be seeking to allege that the prosecution committed a *Brady* violation by failing to

produce exculpatory evidence, *i.e.*, information relevant to the semen sample,[14] or that the state court denied Petitioner due process by failing to grant him the relief requested in his Section 440.30 motion without a hearing.[15]

In particular, Petitioner points out that, during the course of the Section 440.30 proceeding, Respondent finally came forward with the identity of the individual whose semen was found on D.W.'s jeans, informing the state court that:

> the unknown male donor was later identified as Michael Smith. At the time of [Petitioner's] trial, a DNA profile of Michael Smith did not exist. On August 27, 1999 he was arrested and charged as the co-defendant in this crime after his DNA profile matched that of the unknown male donor in [Petitioner's] trial. On June 21, 2000, he was convicted after a jury trial of two counts of Rape in the First Degree, P.L. 130.35 and two counts of Assault in the Second Degree, P.L. 120.05. On July 26, 2000, he was sentenced to a period of 25 years incarceration.

(*See* Memorandum of Law in Response to the Defendant's *Pro Se* CPL § 440.30 (1-A) Motion, dated June 23, 2005, at 5 n.1.) Petitioner now argues that the identification of Michael Smith ("Smith") "cannot be viewed as merely impeaching the People's witnesses, or being cumulative evidence." (Pet. 2/7/06 Aff. at 5.) Rather, Petitioner contends that, had Smith testified at Petitioner's trial, Smith would have been able to "attest to the fact that [Petitioner] was not the

---

[14] Petitioner's papers do not make it clear whether the exculpatory evidence he sought was the DNA analysis of the sample, or the identity of the individual whose DNA matched the semen sample, or both. *See* Pet. 2/7/06 Aff. ¶ 2 (citing a "[f]ailure to disclose information relevant to the DNA test" and arguing that "information relevant to the DNA test" was "missing material [that] was the missing link the [P]etitioner needed to show there were other culprits"); *see also* Petitioner's Legal Argument and Affidavit in Support for Motion Pursuant to C.P.L. § 440.30 at 16 (arguing that the "People have deprived [Petitioner] of the opportunity to make [a] conclusive showing that he is innocent of the crime for which he is incarcerated").

[15] *See* Pet. 2/7/06 Aff. ¶ 6 (noting that Petitioner's Section 440.30 application was denied "without the benefit of a hearing").

man who had participation in the brutal beating and rape . . . and that someone other than [Petitioner] committed the crime." (*Id.*)  In other words, Petitioner appears to contend that, had the prosecution produced information relevant to the DNA testing of the semen sample at the time of trial, Petitioner would have been able to affirmatively establish that the semen sample matched Smith's DNA, and that Smith's testimony would have somehow exonerated Petitioner. On this basis, Petitioner asserts that he "makes a claim of actual innocence accompanied by a claim of a constitutional violation." (*Id.* at 4.)[16]

On March 2, 2006, Respondent submitted a letter brief to this Court "oppos[ing] any newly-exhausted claim arising in connection with the state court's denial of [P]etitioner's § 440.30 motion." (*See* Letter from Assistant Attorney General Malancha Chanda, dated Mar. 2, 2006 ("Resp. 3/2/06 Br.").)  In its letter brief, Respondent argues that, to the extent Petitioner is attempting to assert that the state court's denial of his Section 440.30 motion constituted a violation of a right conferred by a New York statute, or that Petitioner has demonstrated actual innocence based on "exculpatory" DNA evidence, both claims would lack merit under federal law. (*See id.*)  On March 12, 2006, Petitioner submitted a reply in response to Respondent's letter brief. (*See* Pet. 3/12/06 Reply.)

On March 14, 2006, this Court ordered that Petitioner's habeas action be restored to the active calendar of the Court. (*See* Dkt. 15.)

---

[16] On March 24, 2006, Petitioner moved this Court by letter application for discovery of any written statements made by Smith, as well as transcripts of judicial proceedings against Smith.  The Court denied that application by Order dated March 31, 2006. (*See* Dkt. 16 (Mem. Endors.).)

<u>**DISCUSSION**</u>

**I.      <u>APPLICABLE LEGAL STANDARDS</u>**

  **A.      <u>Exhaustion</u>**

   A federal court may not consider a petition for habeas corpus unless the petitioner has

exhausted all state judicial remedies.  *See* 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*,

404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997).  To satisfy the

exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state

courts, thereby affording those courts the "opportunity to pass upon and correct alleged violations

of . . . its prisoners' federal rights."  *Picard*, 404 U.S. at 275 (citation omitted).  Once the state

courts are apprised of the constitutional nature of a petitioner's claims, the exhaustion

requirement is generally fulfilled when those claims have been presented to "the highest court of

the pertinent state."  *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted).

  **B.      <u>Standard of Review</u>**

   Where a federal constitutional claim has been adjudicated on the merits by the state court,

this Court must accord substantial deference to the state court's decision under the standard of

review dictated by AEDPA.  *See* 28 U.S.C. §  2254(d); *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d

Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the

parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced,

rather than on a procedural, or other, ground").  The relevant section of AEDPA provides that

    [a]n application for a writ of habeas corpus on behalf of a person in
    custody pursuant to the judgment of a State court shall not be
    granted with respect to any claim that was adjudicated on the
    merits in State court proceedings unless the adjudication of the
    claim – (1) resulted in a decision that was contrary to, or involved
    an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d).

Under AEDPA, a state court decision is "contrary to" clearly established federal law
where the state court either applies a rule that "contradicts the governing law" set forth in
Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a
[Supreme Court] decision" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362,
405-06 (2000). An "unreasonable application" of clearly established federal law occurs when
the state court identifies the correct governing legal principle, but unreasonably applies that
principle to "a set of facts different from those of the case in which the principle was
announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003). In other words, "the state court's
decision must have been more than incorrect or erroneous" – rather, "[t]he state court's
application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21
(2003) (quoting *Williams*, 529 U.S. at 409).

Where this Court reaches the merits of a claim that has not been decided by the state court
on substantive grounds, the pre-AEDPA *de novo* standard of review applies. *See Cotto v.
Herbert*, 331 F.3d 217, 230 (2d Cir. 2003).

## II.     PETITIONER'S INITIAL CLAIMS

As set forth above, Petitioner pleaded two claims in his Petition, both of which he fully
exhausted, by raising them on direct appeal to the Appellate Division and in his request for leave
to appeal to the New York Court of Appeals. *See Picard*, 404 U.S. at 275; *see also Bossett*,
41 F.3d at 828.

## A.     Alleged Evidentiary Error

In his first claim, Petitioner appears to assert that his Fourteenth Amendment rights to due process were violated by the trial court's improper, and highly prejudicial, admission of D.W.'s out-of-court statement to Officer Welsome that she had been raped by a person by the name of "A Train." (*See* Petition ¶ 13; *see also* Bernstein Decl., Ex. A at 12-20.) According to Petitioner, the state court misapplied the "prompt outcry" exception to the hearsay rule, because that exception is not available where a statement reveals information about the identity of an assailant, and the assailant's identity is in question. (*See* Petition ¶ 13; Bernstein Decl., Ex A. at 14). Respondent argues that this claim is procedurally barred, and, in any event, without merit.

### 1.     Petitioner's Claim is Procedurally Barred.

Federal habeas review of a claim is not available where the question has been decided by a state court, and the state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). The "independent" and "adequate" state law ground need not be substantive. *Id.* It may also be procedural, such as the rejection of a claim as unpreserved under the state's established procedural rules. *See, e.g., Montalvo v. Annetts*, No. 02 Civ. 1056 (LAK) (AJP), 2003 U.S. Dist. LEXIS 22619, at *68-70 (S.D.N.Y. Dec. 17, 2003) (failure to comply with New York state's "contemporaneous objection" rule is an adequate and independent state law ground supporting a judgment), *adopted by* No. 02 Civ. 1056 (LAK) (S.D.N.Y. Jan. 20, 2004); *Jamison v. Duncan*, No. 01 Civ. 2909 (WHP) (GWG), 2002 U.S. Dist. LEXIS 16582, at *8-9 (S.D.N.Y. Sept. 5, 2002) (same), *adopted by* No. 01 Civ. 2909 (WHP) (S.D.N.Y. Sept. 5, 2002).

In evaluating whether the state court has found a claim to be procedurally defaulted under state law, this Court must look to the last reasoned state court opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[W]here . . . the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits."). To determine whether the state law ground on which the state court rested was "truly an *independent* basis for decision or merely a passing reference, such reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (emphasis added) (internal quotation marks and citation omitted); *see also Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (to preclude federal review, the state court "must 'clearly and expressly state[] that its judgment rest[ed] on a state procedural bar'") (citation omitted). To be deemed *adequate*, the state procedural rule on which the court's decision was based must be a rule that is "firmly established and regularly followed" by the state in question, *see Ford v. Georgia*, 498 U.S. 411, 423-24 (1991), and must not have been "misapplied in [the petitioner's] case in particular," *Cotto*, 331 F.3d at 240 (internal quotation marks and citation omitted).

Under New York Law, Petitioner was required to raise a contemporaneous objection to the trial court's evidentiary ruling, in order to preserve the issue for appeal. *See Jones*, 126 F.3d at 414 (citing N.Y. Crim. Proc. L. § 470.05). As Respondent correctly observes, however, Petitioner did not object at trial to the introduction of D.W.'s statement to Officer Welsome. (*See, e.g.,* 6/4/99 Tr. at 126-27; *see also* Bernstein Decl., Ex. B at 27-30.) Further, at the time the court issued a pre-trial ruling regarding the admissibility of this evidence, Petitioner raised a different objection than the one he now tries to present. (*See supra* Section A ("Pre-Trial

Rulings").)  Under these circumstances, the claim was not preserved for appeal.  *See, e.g.,*

*People v. Spratley*, 237 A.D.2d 545, 546 (2d Dep't 1997) (holding that defendant's claim was

unpreserved because defendant's objection during summation had different basis).

The state procedural rule requiring preservation is firmly established in New York state

law and regularly followed, and is thus an "adequate" ground for the Appellate Division's

rejection of Petitioner's claim.  *See Hooks v. Greene*, No. 04 Civ. 297 (SAS), 2005 U.S. Dist.

LEXIS 20295, at *14 (S.D.N.Y. Sept. 16, 2005).  Moreover, Petitioner has not shown that the

state preservation rule was "misapplied in his case in particular," *see Cotto*, 331 F.3d at 240, nor

could he, as New York courts consistently apply the rule to claims such as his.  *See, e.g.,*

*People v. Iannelli*, 69 N.Y.2d 684, 685 (1986) ("the rule requiring a defendant to preserve his

points for appellate review applies generally to claims of error involving Federal constitutional

rights").

Petitioner's failure to comply with New York's preservation rule therefore constitutes an

adequate and independent state ground for the state court's decision, procedurally barring

Petitioner's claim.  *See, e.g., Jamison*, 2002 U.S. Dist. LEXIS 16582, at *9-10; *see also Brown v.*

*Senkowski*, Nos. 97 Civ. 3862, 4415 (MBM), 2004 U.S. Dist. LEXIS 25643, at *66 (S.D.N.Y.

Dec. 14, 2004) (conclusion by a state court in its opinion that a claim is unpreserved for appellate

review constitutes an independent and adequate state law ground).[17]  Accordingly, this Court may

---

[17] As Respondent correctly notes, the fact that the Appellate Division also stated that
"[w]ere we to review this claim, we would find that the officer's concise, accurate representation
of the victim's one-sentence statement did not convey accompanying details beyond those
necessary" does not vitiate the procedural bar.  (*See* Resp. Mem. at 28-29; *see also Harris v.*
*Reed*, 489 U.S. 255, 264 n.10 (1989); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990)
(where a state court expressly relies on a procedural default in rejecting the claim, but also notes
that it would reject the claim on the merits as well, federal habeas review remains procedurally
barred).)

not review the claim, unless Petitioner can overcome the procedural bar by demonstrating both

cause for failing to preserve the claim in state court and prejudice resulting from the alleged

constitutional error of the trial court, or by demonstrating that a fundamental miscarriage of

justice would occur as a result of the Court's failure to review the habeas claim. *See Coleman*,

501 U.S. at 750.

Here, Petitioner has not made a showing of cause, as he has not even come forward with

an explanation for his failure to object to Officer Welsome's testimony regarding D.W.'s

statement on the ground he asserts here. Because Petitioner cannot show cause for his procedural

default, the Court need not address prejudice with respect to this claim. *See Stepney v. Lopes*,

760 F.2d 40, 45 (2d Cir. 1985).

Moreover, Petitioner has not demonstrated "a sufficient probability that our failure to

review his federal claim will result in a fundamental miscarriage of justice." *Edwards v.

Carpenter*, 529 U.S. 446, 451 (2000) (citing *Coleman*, 501 U.S. at 750). To meet this standard,

Petitioner would have to show that a constitutional violation resulted in his conviction despite his

actual innocence. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986). Petitioner's burden of

demonstrating "actual innocence" requires him to put forth "new reliable evidence that was not

presented at trial" and to show that, in light of that evidence, "it is more likely than not that no

reasonable juror would have found [him] guilty beyond a reasonable doubt." *Lucidore v. New

York Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000) (citation omitted). Neither the Petition in

his case, nor any supplemental submission by Petitioner, offers such evidence, and there is thus

nothing from which this Court could conclude that a fundamental miscarriage of justice would occur absent the Court's review of the claim.[18]

For all of these reasons, Petitioner cannot overcome the procedural bar on his claim with respect to the trial court's evidentiary ruling, and, therefore, I recommend that the claim be dismissed.

**2.      In Any Event, Petitioner's Evidentiary Claim Is Not Cognizable on Habeas Review.**

When presented with a federal habeas petition that alleges an erroneous ruling by the trial court, this Court's review is "limited to determining whether the alleged error rose to the level of a constitutional violation." *Copes v. Schriver*, No. 97 Civ. 2284 (JGK), 1997 U.S. Dist. LEXIS 16349, at *8 (S.D.N.Y. Oct. 22, 1997); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). Thus, even if he could overcome the procedural bar, Petitioner would still not be able to succeed on his habeas claim, unless he could establish that the trial court's admission of Officer Welsome's testimony regarding D.W.'s incriminating statement "was error that infected the entire trial such that [Petitioner's] conviction violates due process." *See Gonzalez v. Walker*, No. 99 Civ. 9732 (KMW) (KNF), 2001 U.S. Dist. LEXIS 10844, at *17 (S.D.N.Y. July 31, 2001) (habeas relief denied where petitioner failed

---

[18] Although Petitioner does argue that he is "actually innocent" in connection with his claims arising from the denial of his Section 440.30 motion, he has offered no exculpatory evidence to support that bare assertion. Indeed, as discussed further below (*see infra* at Section III(A)), the mere fact that Petitioner's DNA did not match that of the DNA from the sample in question (a fact that was known and related to the jury at trial) does not establish his innocence, as the evidence at trial was sufficient to demonstrate that D.W. was assaulted and raped by more than one man.

to show how the trial court's refusal to instruct the jury on the issue of consciousness of guilt had a "substantial and injurious effect or influence in determining the jury's verdict") (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993)), *adopted by Gonzalez v. Walker*, No 99 Civ. 9372 (S.D.N.Y. Dec. 14, 2001).

Here, however, Petitioner has not established that the court's admission of Officer Welsome's testimony regarding D.W.'s out-of-court statement was the kind of error that would warrant habeas review, assuming the court's ruling was even erroneous. If D.W.'s hearsay statement had been excluded by the trial court, the remaining evidence of Petitioner's guilt would still have been substantial, as described in detail above. Viewing the trial record as a whole, it cannot be said that the court's admission of D.W.'s statement identifying "A Train" as her assailant "so infused the trial with unfairness as to deny due process of law." *Estelle*, 502 U.S. at 75.

Accordingly, Petitioner's evidentiary claim should be dismissed as procedurally barred and, in any event, as not cognizable on habeas review.

## B.   Legal Insufficiency

In his second claim, Petitioner asserts that the evidence at trial was legally insufficient to prove beyond a reasonable doubt that Petitioner used the floor of the bus to cause injury to D.W. and that, as a result, his conviction for assault was improper. (*See* Petition; *see also* Bernstein Decl., Ex. A at 17-20.) Specifically, Petitioner argued on appeal that "[w]hile the evidence was clearly sufficient to establish that [D.W.] suffered physical injury during the attack, there was simply not enough evidence linking her injuries to the floor of the bus." (*See* Bernstein Decl., Ex. A at 19.) The Appellate Division rejected this claim, holding that it was unpreserved. (*See*

Bernstein Decl., Ex. C.)  The Appellate Division noted, however, that, were it to review the claim, it would find that the verdict was based on legally sufficient evidence, as "[t]he jury could have reasonably concluded from the circumstances of the assault that [Petitioner's] act of banging the victim's head against the floor caused her to sustain injuries to the side of her head and substantial pain."  (*Id.*)

      As an initial matter, Respondent is correct that Petitioner's legal insufficiency claim is procedurally barred.  (*See* Resp. Mem. at 37-40.)  Petitioner did not object to the jury charge on Assault in the Second Degree either during the charging conference, in which the court phrased a portion of the charge as requiring the prosecution to prove "intentional assault with a dangerous instrument . . . [specifically,] the floor of the bus, causing physical injury" (6/9/99 Tr. at 450-51), or during the court's delivery of the charge to the jury, when the court stated, *inter alia*, that the prosecution was required to prove that Petitioner "caused the physical injury to [D.W.] by means of a dangerous instrument, to wit, the floor of a bus" (*see id.* at 582-84).  Moreover, as Petitioner has not even alleged any cause for his failure to preserve this claim, and cannot meet the "fundamental miscarriage of justice" exception, Petitioner cannot overcome the procedural bar.  (*See supra* Section II(A)(1).)  The claim is therefore subject to dismissal on this basis.

      Moreover, regardless of the procedural bar, Petitioner's legal insufficiency claim lacks merit.  "In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden."  *United States v. Giraldo*, 80 F.3d 667, 673 (2d Cir. 1996).  "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  Such an inquiry "does not

require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt,'" rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 318-19 (emphasis in original) (citations omitted); *see also United States v. Carson*, 702 F.2d 351, 361 (2d Cir. 1983) (a court must determine "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt . . . view[ing] the evidence in the light most favorable to the government, and constru[ing] all permissible inferences in its favor") (internal citations omitted). In making this determination, "pieces of evidence must be viewed in conjunction, not in isolation." *United States v. Podlog*, 35 F.3d 699, 705 (2d Cir. 1994) (citation omitted). Furthermore, the jury retains "exclusive[] responsib[ility] for determining a witness' credibility." *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (citation omitted).

In order to sustain the charge of Assault in the Second Degree against Petitioner, the prosecution was required to establish, beyond a reasonable doubt, that Petitioner, with "intent to cause physical injury to another person," caused "such injury to such person . . . by means of a deadly weapon or a dangerous instrument." N.Y. Penal L. § 120.05(2). Here, the "dangerous instrument" at issue was the floor of the bus (*see, e.g.,* Bernstein Decl., Ex. A at 19), and the evidence adduced at trial was sufficient to establish, beyond a reasonable doubt, that at least some of the physical injury sustained by D.W. during the attack resulted from Petitioner's use of that dangerous instrument. As D.W. testified, Petitioner and the other individual banged her head against the floor "countless" times. (*See* 6/4/99 Tr. at 53, 55.) Further, Tenenbaum

corroborated D.W.'s testimony by stating that, upon examining D.W. after the attack, he observed that she had black and blue marks on the right side of her head, as well as "subconjunctival hemorrhages" in her eyes, both of which were consistent with "direct or indirect trauma to the head." (*See id.* at 347-55.) Further, Tenenbaum testified that D.W. was apparently experiencing severe headaches and blurred vision in the emergency room. (*Id.* at 347-48.) In light of such evidence, the jury could have reasonably inferred that Petitioner used the floor of the bus to cause physical injury to D.W.

Further, "'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.'" *Edwards v. Jones*, 720 F.2d 751, 755 (2d Cir. 1983) (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979)). Thus, D.W.'s testimony regarding how her injuries were sustained would alone be sufficient to sustain the assault verdict against Petitioner. Certainly, viewing the totality of the evidence at trial, including the medical evidence, it was both "fair" and "logical" for the jury to conclude that Petitioner was guilty of Assault in the Second Degree beyond a reasonable doubt. *See Carson*, 702 F.2d at 361; *see also People v. Galvin*, 65 N.Y.2d 761, 762-63 (1985) (finding that "there is no reasonable view of the evidence other than that the victim's injuries resulted from the pounding of his head against the pavement" and holding that the sidewalk was used as a dangerous instrument).

Accordingly, Petitioner's claim should be dismissed as procedurally barred, and, in any event, without merit.[19]

_____

[19] As noted above, the Appellate Division declined to reach the merits of Petitioner's claim, but added that, if it were to reach the claim, it would deny it as without merit. (*See* Bernstein Decl., Ex. C.) Where the state court has not reached the merits of a claim, this Court should review the claim *de novo*. *See Cotto*, 331 F.3d at 230. Nonetheless, the state court's comments that it would find the claim to be without merit may be entitled to some degree of

30

## III.   PETITIONER'S ADDITIONAL CLAIMS

As noted above, it appears that, through his most recent submissions to this Court (following the state court's denial of his Section 440.30 motion), Petitioner may be seeking to assert additional claims. Any such claims, however, are either not cognizable in this habeas proceeding or should be dismissed as without merit.

### A.   "Actual Innocence" Claim

Although Petitioner contends that he is actually innocent of the crimes for which he was convicted, and that Smith was the "true perpetrator" of D.W.'s rape and assault (*see* Pet. 2/7/06 Aff. at 3-5), a stand-alone claim of "actual innocence" is not cognizable on habeas review. *See, e.g., Herrera v. Collins*, 506 U.S. 390, 400, 113 S. Ct. 853, 860, 122 L. Ed. 2d 203 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the course of the underlying state criminal proceeding.").

In any event, Petitioner has made no showing of actual innocence, based on any new evidence that "was not presented at trial." *See Lucidore*, 209 F.3d at 114. Indeed, as Petitioner himself acknowledges, Tibbo had already typed the semen stain on D.W.'s jeans at trial, and testified to her conclusion that the DNA from the sample did *not* belong to Petitioner. Moreover, Petitioner has not presented a sworn affidavit from Smith stating that Petitioner was not involved in the rape and assault, and thus the Court has no basis to conclude that Smith would have exonerated Petitioner, had Smith testified at Petitioner's trial. Moreover, given the strength of

---

deference. *See* 28 U.S.C. § 2254(d). Regardless of which standard of review applies here, Petitioner's claim would be subject to dismissal on the merits because, as discussed above, there is more than sufficient evidence in the record to support the jury's verdict on the assault charge.

the evidence against Petitioner – including D.W.'s testimony that she was attacked by more than one man, her unequivocal identification of Petitioner as one of her assailants, the fact that Petitioner's blood was found on D.W.'s clothing, and the fact that D.W.'s blood was found on Petitioner's clothing – it cannot be said that the identification of Smith as the person whose semen was found on D.W.'s jeans would have made "it is more likely than not that no reasonable juror would have found [Petitioner] guilty beyond a reasonable doubt." *Id.*

Accordingly, I recommend that Petitioner's "actual innocence" claim be dismissed.

## B.   Nondisclosure of Exculpatory Evidence

To the extent Petitioner is asserting a *Brady* violation, his claim should be dismissed for lack of merit.[20]

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Information falling within the scope of the *Brady* rule "includes not only evidence that is exculpatory, *i.e.*, going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

---

[20] Although Petitioner apparently never brought a *Brady* claim to the state court's attention, and thus any such claim is unexhausted, this Court may dismiss an unexhausted claim on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

In a habeas proceeding, it is the petitioner's burden to demonstrate that the evidence in question actually existed at the time of trial, and was withheld from production. *See Brown v. Riley*, No. 90 Civ. 7776 (MBM), 1994 U.S. Dist. LEXIS 10224, at *9-10 (S.D.N.Y. July 28, 1994). Further, the prosecution's obligation to disclose material under *Brady* is limited to evidence that is "material." *Avellino,* 136 F.3d at 256 (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (citation omitted). "In other words, evidence is material if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Orena*, 145 F.3d 551, 557 (2d Cir. 1998) (quoting *Kyles*, 514 U.S. at 435). Impeachment evidence is material "where the witness in question supplied the only evidence linking the defendant to the crime" or "where the witness supplied the only evidence of an essential element of the offense." *Avellino*, 136 F.3d at 256-57 (citations omitted). Impeachment evidence is *not* material where it would "not likely . . . have changed the verdict," even though the evidence might have been "useful to the defense." *Giglio*, 405 U.S. at 154. In other words, a showing of prejudice is an essential component of any "true *Brady* violation." *Strickler v. Green*, 527 U.S. 263, 281-82 (1999) (citations omitted).

Here, there is no basis for concluding that, at the time of Petitioner's trial, the prosecution actually had in its possession any information regarding Smith's identity (or that a DNA profile for Smith was available, so that the semen sample could have been matched to him); in fact, the only indication before the Court is to the contrary. Further, for the reasons discussed above in

connection with Petitioner's claim of "actual innocence," Petitioner cannot demonstrate that, had the prosecution produced the semen sample to Petitioner for testing, the outcome at trial would have been any different. The fact that the sample did not match Petitioner's DNA was already known, and placed before the jury, which nonetheless concluded, based on substantial inculpatory evidence, that Petitioner had participated in the crimes for which he was charged. Thus, at a minimum, Petitioner cannot show the "prejudice" required to prevail on a *Brady* claim, and any such claim should be dismissed.

### C.    State Court's Denial of Petitioner's Request for DNA Testing

Finally, although this is not clear from his submissions to this Court, Petitioner may be attempting to challenge the state court's refusal to order that the semen sample be re-tested. To the extent any such claim would be based on a New York statutory right, it would not be cognizable in this federal habeas proceeding. *See, e.g., Shenouda v. Breslin*, No. 03 CV 5767 (JG), 2004 U.S. Dist. LEXIS 17018, at *15 (E.D.N.Y. Aug. 27, 2004) (holding that, to the extent a petitioner "claims a violation of a right conferred by New York statute, his claim is not cognizable on habeas review").

Further, to the extent Petitioner is claiming that the state court deprived him of his right to due process by denying his Section 440.30 motion without a hearing, Petitioner cannot actually demonstrate the violation of a constitutional right. There is no constitutional provision that even requires a state to grant post-conviction review, *see Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987), and, therefore, most federal courts have rejected due process claims arising out of the conduct of state courts in post-conviction proceedings, holding that such claims are also not cognizable on habeas review, *see, e.g., Jones v. Duncan*, 162 F. Supp. 2d 204, 217-19 (S.D.N.Y.

2001) ("While the Second Circuit has not directly addressed this issue, district court decisions within the Circuit (several of which have been affirmed by the Second Circuit) have followed [this] majority rule."). Moreover, "the Supreme Court has not established, clearly or otherwise, a constitutional right to postconviction DNA testing." *Shenouda*, 2004 U.S. Dist. LEXIS 17018, at *15. Thus, the Court should dismiss any due process claim arising out of the conduct of the state court in denying Petitioner's Section 440.30 motion.

## CONCLUSION

For the foregoing reasons, I recommend that Petitioner's petition for a writ of habeas corpus be DISMISSED in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, United States Courthouse, 40 Centre Street, Room 410, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 40 Centre Street, Room 631, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Daniels. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38

(2d Cir. 1983).

Dated: New York, New York
     April 25, 2006

Respectfully submitted,

_____
DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Mr. Mark V. Green
(99-A-4042)
Sullivan Correctional Facility
P.O. Box 116, Riverside Drive
Fallsburg, NY 12733-0116

Malancha Chanda, Esq.
Assistant Attorney General
120 Broadway
New York, NY 10271